

FILED
Apr 21 2015, 9:44 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEES |
|---|---|
| Richard C. Wolter | Jonathan Halm |
| Merrillville, Indiana | Abrahamson, Reed & Bilse |
| | Hammond, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Andrew Meyer, | April 21, 2015 |
| *Appellant-Plaintiff,* | Court of Appeals Case No. 64A03-1406-CT-205 |
| v. | Appeal from the Porter Superior Court. |
| Beta Tau House Corporation, Beta Tau of Sigma Pi, Sigma Pi Fraternity International, Inc., and Quentin Calder, | The Honorable Roger V. Bradford, Judge. |
| *Appellees-Defendants.* | Cause No. 64D01-1103-CT-2429 |

**Baker, Judge.**

[1] Andrew Meyer filed a complaint against Beta Tau House Corporation (House Corporation), Beta Tau of Sigma Pi (Beta Tau), Sigma Pi Fraternity International, Inc. (Sigma Pi), and Quentin Calder. At issue in this appeal are Meyer's claims for negligence against House Corporation, Beta Tau, and Sigma Pi; violation of the Dram Shop Act[1] against Beta Tau; and defamation against Calder and the House Corporation. The trial court granted summary judgment in favor of the defendants on all of these claims. Meyer argues that the summary judgment order was erroneous because there are genuine issues of material fact related to each claim. Finding no error, we affirm.

## Facts

### The Parties

[2] Sigma Pi is a men's collegiate fraternal organization that charters local chapters of the fraternity. In 2009, Sigma Pi had over 120 local chapters in the United States and Canada. Beta Tau, which is affiliated with Valparaiso University, is one of the local chapters chartered by Sigma Pi. Beta Tau's relationship with Sigma Pi is governed by Sigma Pi's Constitution and By-Laws. Compliance with these documents is monitored from time to time by an alumni volunteer who serves as a liaison between a local chapter and Sigma Pi. The method by which local chapters implement Sigma Pi's standards are determined by each local chapter. In other words, each chapter must abide by general standards

---

[1] Ind. Code § 7.1-5-10-15.5.

and policies but retains the independence to determine the way in which it will enforce such policies. Each local chapter has its own set of by-laws. Sigma Pi does not control, manage, or supervise the daily activities of its local chapters.

[3] Sigma Pi discourages alcohol abuse at its local chapters, and has disciplined chapters for incidents of alcohol abuse in the past. It instructs local chapters in risk management guidelines related to alcohol abuse.

[4] House Corporation owns two houses for Beta Tau members. The houses are located at 803 (the 803 house) and 805 (the 805 house) Brown Street in Valparaiso. House Corporation owns the real estate and leases the houses to undergraduate members of Beta Tau. All activity incident to ownership of the property, including finances and maintenance, is conducted by House Corporation. House Corporation does not control, manage, or supervise the daily activities of fraternity members who visit or live in the houses.

[5] During the relevant period of time, Meyer and Daniel Meals were students of Valparaiso University and members of Beta Tau, and both were over the age of twenty-one. Meals lived in the 803 house; Meyer did not live in either house. Calder was an alumni member of Beta Tau and the president of the House Corporation. He served as a volunteer.

## Prologue

[6] In May 2008, Meyer poured urine on the windshield of Meals's truck. Meals then punched Meyer in the nose. Meyer did not report the incident to Sigma Pi or House Corporation, and although some of the Beta Tau members became

aware of the incident, he did not make a formal report of the altercation or request that any action be taken against Meals.

## The Incident

On March 20, 2009, Meyer began drinking alcohol at approximately 6:00 p.m. at a local restaurant. He continued drinking in his apartment for several hours, until approximately 11:00 p.m. At that time, Meyer went to the 805 house with a group of his friends to socialize with a group of members, alumni, and pledges that had gathered there, including Meals. Meyer brought a handle of whiskey to share with the group. Meyer remembers drinking the whiskey at this gathering and does not recall drinking anything else. Meyer remembers seeing beer in the refrigerator of the 805 house, but cannot recall how much beer there was, who it belonged to, what kind of beer it was, or who purchased it. Meyer recalls seeing alcohol being served from the bar, and believes the alcohol had been brought by various members. Although Meyer claims that he saw Meals drinking alcohol that night, he does not remember what kind of alcohol it was, and does not recall if Meals was drinking the beer from the refrigerator.

At approximately 2:30 a.m., Meyer and Chris Tormos left the 805 house and went next door to the 803 house. Meyer and Tormos socialized for approximately half an hour. Meyer characterizes this gathering as a party, but the only other person present in the house was Meals's girlfriend, who was in Meals's room. Around 3:00 a.m., Meyer and Tormos began calling friends in an attempt to find a ride home. Meyer admits that he was drunk at this time.

[9] While Meyer was leaving a voicemail for a friend, Meals walked into the house. The rest of the incident was recorded on the voicemail message. As soon as Meals walked in the door, Meyer called him an "asshole" twice and Tormos demanded of Meals, "who the fuck are you?" Appellees' App. p. 84. A heated verbal exchange followed, during which Meyer taunted and goaded Meals, shouting at him to "move the fuck on." *Id.* Tormos attempted to calm the situation, repeatedly telling Meyer to "shut the fuck up," while Meals's girlfriend repeatedly told Meals to "stop." *Id.* The exchange turned physical. While Meyer and Meals dispute who first resorted to physical violence, Meyer sustained injuries as a result of the altercation.

## The Aftermath

[10] The day after the incident, Meyer filed a police report. That same day, Calder found out about the incident from Meals and other members. Calder eventually learned that Meyer had filed a police report.

[11] Calder began a discussion with Karl Strasen, who was President of Beta Tau, and Matt Smith, who was Beta Tau's liaison to alumni members, about the incident. They discussed how to address the legal and personal conflict between Meyer and Meals. Smith and Strasen reported that Meyer had been visiting the houses after he filed the report, and that his visits were causing divisions within Beta Tau's membership. Calder became concerned about the visits exacerbating an already tense situation and about Meyer's decision to publicly press charges against Meals and the effects that could have on Beta Tau and House Corporation. Calder obtained input from Mark Briscoe, the

President of Sigma Pi, and Jennifer Jones Hall, the Assistant Dean of Greek Life at Valparaiso University.

[12] Calder decided to make a non-binding request that Meyer stay away from the fraternity premises until further notice. On March 25, 2009, Calder sent a letter to Meyer (the Letter). The Letter was carbon copied to the four other officers of the House Corporation and to Strasen. Among other things, the Letter stated as follows:

> . . . Given that you don't remember the events that took place on that morning I am of the mindset that you are actually more interested in settling an outstanding vandetta [sic] against a current active member living at the house than in getting some type of justice.
>
> The police report you filed is now being viewed by everyone, this includes the University and other alumni as well as the city. Being that you are aware House Corporation's next step is to try and get a permit to replace the foundation of the house, I consider this frivolous attempt at retribution as a blatent [sic] disregard for the fraternity and the House Corporation as a whole.
>
> I cannot allow an active member to use the law and the fraternity grounds to settle a score.
>
> That said, since the member you have filed charges against is currently living at the fraternity house and you are not, I would highly recommend that you avoid the fraternity properties until further notice.
>
>                                     ***
>
> Should additional actions of yours come to light that further prove your intentions of retribution[,] the [H]ouse [C]orporation will re-evaluate the situation at that time.

Appellant's App. p. 463.

Thereafter, Meyer pursued Valparaiso University Campus Judiciary Board proceedings against Meals. As a result of these proceedings, Meals was suspended for one semester and prohibited from being on campus or attending off-campus University events during that time.

Calder learned that Meyer had still been visiting the fraternity houses after receiving the Letter. Consequently, on May 23, 2009, Calder sent an email to Meyer, stating, "[a]s promised in my previous communication to Mr. Meyer in relation to his continuing 'vendetta' against Dan Meals, Andrew Meyer is hereby banned from the Sigma Pi properties . . . indefinitely." *Id.* at 464. The House Corporation officers, Strasen, and Smith were carbon copied on the email.

## The Litigation

On March 18, 2011, Meyer filed a complaint against the Defendants. He included the following claims: (1) assault and battery against Meals;[2] (2) negligence against Sigma Pi, Beta Tau, and the House Corporation; (3) violation of the Dram Shop Law against Beta Tau; and (4) defamation against Calder and the House Corporation. The Defendants denied Meyer's claims and raised eighteen affirmative defenses. Eventually, the trial court

---

[2] The claims against Meals are not part of this appeal and are still pending before the trial court.

granted the Defendants' motion that Meyer's personal injury and negligence claims be tried separately from his defamation claims.

On April 10, 2013, Sigma Pi, Beta Tau, and the House Corporation moved for summary judgment on the negligence claims, and Calder and the House Corporation moved for summary judgment on the defamation claims. Following extensive briefing and a hearing, the trial court granted summary judgment in favor of the Defendants on the negligence and defamation claims on March 6, 2014. Meyer now appeals.

# Discussion and Decision

## I. Standard of Review

Our standard of review on summary judgment is well established:

> We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp,* 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).
>
> The initial burden is on the summary-judgment movant to "demonstrate [ ] the absence of any genuine issue of fact as to a determinative issue," at which point the burden shifts to the non-movant to "come forward with contrary evidence" showing an issue for the trier of fact. *Id.* at 761–62 (internal quotation marks and substitution omitted). And "[a]lthough the non-moving party has the

burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that he was not improperly denied his day in court." *McSwane v. Bloomington Hosp. & Healthcare Sys.,* 916 N.E.2d 906, 909–10 (Ind. 2009) (internal quotation marks omitted).

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).

# II.  Negligence

[18]  To prove a negligence claim, a plaintiff must show that (1) the defendant owed plaintiff a duty, (2) the defendant breached that duty, and (3) plaintiff's injury was proximately caused by the breach.  *Winfrey v. NLMP, Inc.*, 963 N.E.2d 609, 612 (Ind. Ct. App. 2012).  Whether a defendant owes a duty of care to a plaintiff is a question of law for the court to decide.  *Id.*  To determine whether a duty exists, we must consider the relationship between the parties, the reasonable foreseeability of harm to the person injured, and public policy concerns.  *Yost v. Wabash College*, 3 N.E.3d 509, 515 (Ind. 2014).

[19]  While summary judgment is rarely appropriate in negligence cases, it is appropriate when the undisputed material evidence negates one element of a negligence claim.  *Winfrey*, 963 N.E.2d at 612.

# A.  Sigma Pi

# 1.  Duty

[20]  Meyer argues that Sigma Pi assumed a duty to inform and guide Beta Tau on policies relating to alcohol abuse.  *See Ember v. BFD, Inc.*, 490 N.E.2d 764, 769 (Ind. Ct. App. 1986) (holding that a person or entity can assume a duty of care

through affirmative conduct). Both parties direct our attention to two recent Indiana Supreme Court cases on the issue of duties assumed by a national fraternity.

## a. *Yost v. Wabash College*

In *Yost v. Wabash College*, a college freshman and fraternity pledge suffered injuries in a hazing incident that occurred at his fraternity house. 3 N.E.3d 509 (Ind. 2014). Yost sued a number of defendants, including the national fraternity of which his local fraternity was a chapter. Yost argued that the national fraternity had assumed a duty to him by engaging in the following behavior:

- disapproving of hazing and promoting "gentlemanly behavior" in its printed charters, bylaws, aspirational enactment, and promotional materials;
- annually providing each local chapter with a risk guide from the national fraternity's insurance company that prohibits hazing; and
- requiring that each fraternity member complete an online course on fraternity life that contains instruction on the dangers of hazing.

*Id.* at 520. The trial court granted summary judgment in favor of the national fraternity, and Yost appealed.

Our Supreme Court noted that the concept of assumed duty "requires a focus upon the specific services undertaken. While an actor may be accountable for negligence in the performance of certain services actually undertaken, such liability does not extend beyond the undertaking." *Id.* at 521. Ultimately, the *Yost* Court found no assumed duty:

Here, the materials designated on summary judgment provide evidence that the national fraternity engaged in educational outreach programs to enhance proper behavior and to discourage hazing. But the specific undertaking did not extend to actual oversight and control over the behavior of individual student members of the local fraternity. Yost does not predicate his claim on alleged negligence by the national fraternity in the formulation and dissemination of its educational material—the specific services arguably undertaken by the national fraternity. We find that the national fraternity did not assume any duty upon which Yost may now claim liability for damages.

*Id.* Our Supreme Court affirmed the trial court's grant of summary judgment in favor of the national fraternity based on the absence of a duty.

## b. *Smith v. Delta Tau Delta*

[23] Three months after *Yost*, our Supreme Court considered a similar scenario in *Smith v. Delta Tau Delta, Inc.*, 9 N.E.3d 154 (Ind. 2014). In *Smith*, a freshman college student and pledge of a fraternity died from acute alcohol ingestion. His parents sued a number of defendants for wrongful death, including the national fraternity. Smith's parents contended that the national fraternity had assumed a duty to protect freshman pledges from hazing and the dangers of excessive alcohol consumption by:

- Enacting a constitution, bylaws, and membership responsibility guidelines that disapprove of hazing and irresponsible and underage drinking
- Providing an online alcohol education program that all pledges were required to complete
- Recommending that local chapters have a house risk manager and providing educational materials to house risk managers

*Id.* at 162.  The trial court granted summary judgment in favor of the national fraternity, and the Smiths appealed.

[24]  First, our Supreme Court noted that there was no evidence establishing that the national fraternity "had a right to exercise direct day-to-day oversight and control of the behavior" of the local fraternity and its members.  *Id.* at 163.  The Court also emphasized that "[l]ike *Yost*, the specific duty undertaken in regards to the policies on hazing and underage and irresponsible drinking was an educational one without any power of preventative control."  *Id.*  Ultimately, our Supreme Court found that the national fraternity had not assumed a duty to the Smiths' decedent:

> we find that the national fraternity's involvement with the local fraternity, while more extensive than in *Yost,* fails to establish any significant difference in the nature of the specific services undertaken— providing information to the local fraternity to discourage hazing and alcohol abuse and disciplining chapters and members for violations.  There is no evidence that the national fraternity assumed any duty of preventative, direct supervision and control of the behaviors of its local chapter members.  While it certainly was the commendable objective of the national fraternity to actively engage in programs to discourage hazing and alcohol abuse, we find that the specific services assumed by the national fraternity did not rise to the level of assuring protection of the freshman pledges from hazing and the dangers of excessive alcohol consumption—the assumed duty alleged by the plaintiffs.  *The national fraternity did have a duty of reasonable care in the performance of its assumed duty of providing information and guidance.*  But the national fraternity's conduct did not demonstrate any assumption of a duty directly to supervise and control the actions of the local fraternity and its members.  The national fraternity did not have a duty to insure the safety of the freshman pledges at the local fraternity.

*Id.* at 163 (emphasis added). The *Smith* Court affirmed the grant of summary judgment in favor of the national fraternity.

## c. Sigma Pi's Duty

Meyer attempts to distinguish *Yost* and *Smith* from the instant case. He insists that he is not arguing that Sigma Pi assumed a duty to protect him. Instead, he argues that Sigma Pi assumed the duty arguably acknowledged by the *Smith* Court—the duty to provide information and guidance. Meyer contends that Sigma Pi assumed this duty by engaging in the following behavior:

- Enacting bylaws that regulate the use of alcohol at local fraternity chapters and define "alcohol abuse," appellant's app. p. 228;
- Adopting the Fraternal Information and Programming Group's (FIPG) Risk Management Policy, which prohibit purchasing alcohol with common funds, prohibit a common source of alcohol, and prohibit underage drinking; and
- Disciplining local chapters for alcohol abuse in the past.

In Meyer's words, the bylaws and FIPG Guidelines "plainly establish that Sigma Pi voluntarily assumed a duty to inform and guide Beta Tau in this case." Appellant's Br. p. 12.

Initially, we observe the wealth of caselaw standing for the proposition that a national fraternity does not assume a general duty to protect local fraternity chapters or their members. *Smith*, 9 N.E.3d at 163; *Yost*, 3 N.E.3d at 520-21; *Delta Tau Delta v. Johnson*, 712 N.E.2d 968 (Ind. 1999); *Foster v. Purdue Univ. Chapter*, 567 N.E.2d 865 (Ind. Ct. App. 1991). As in those cases, the nature of Sigma Pi's involvement with its local fraternities and its efforts to combat the

problems of alcohol abuse are not sufficient to assume a general, broad duty to protect.

[28] We question Meyer's attempt to focus on one sentence of *Smith* without addressing the entire context of the case. For argument's sake, however, we will entertain the possibility that Sigma Pi assumed a very specific duty to guide and inform its local chapters and their members.[3]

## 2. Breach

[29] Meyer next contends that there is a genuine issue of material fact regarding whether Sigma Pi breached its duty to inform and guide Beta Tau and its members. First, Meyer directs our attention to evidence that he claims establishes that Sigma Pi employees "actively participated with Beta Tau in breaking the very policies that Sigma Pi promulgated." Appellant's Br. p. 13. Meyer contends that the record shows that a Sigma Pi chapter consultant visited Beta Tau annually and would "party" with the members. *Id.*

[30] Meyer also contends that Sigma Pi did nothing to educate Beta Tau on alcohol abuse in fraternity life. Instead, Sigma Pi's guidance focused on marketing rather than risk management.

---

[3] Our discussion of the elements of breach and proximate cause should be understood as entirely hypothetical. In other words, because we have concluded that Sigma Pi had no duty in this case, the elements of breach and proximate cause are moot. We choose to engage in the discussion because these issues frequently recur and we believe the discussion is warranted, but it should not be construed as support for an argument that the duty element was met in this case.

[31] We question the breadth of the so-called "duty to inform and guide." In our view, this duty would primarily extend to the veracity and accurateness of the information provided to Sigma Pi's local chapters. In this case, Beta Tau does not contend that it was misinformed by anything in the materials provided by Sigma Pi. Our instinct, therefore, is to say that, as a matter of law, there was no breach of the duty to inform and guide in this case. But given our standard of review, and giving Meyer the benefit of every doubt, we find that there is a question of fact on the issue of breach and turn next to causation.

## 3. Proximate Cause

[32] Meyer next moves to proximate cause, noting that summary judgment is almost always inappropriate on this issue. *Florio v. Tilley*, 875 N.E.2d 253, 255 (Ind. Ct. App. 2007). If, however, a case is plain and undisputable, and only a single inference or conclusion may be drawn from the evidence, the question of proximate cause may be determined as a matter of law. *Miller v. Bernard*, 957 N.E.2d 685, 697 (Ind. Ct. App. 2011). The defendant's conduct is the proximate cause of a plaintiff's injury when the injury is "the natural and probable consequence of the negligent act which, in light of the attending circumstances, could have been reasonably foreseen or anticipated." *Arnold v. F.J. Hab, Inc.*, 745 N.E.2d 912, 917 (Ind. Ct. App. 2001).

[33] Meyer again emphasizes that "the chapter consultants from Sigma Pi abused alcohol with members of the fraternity, and educated Beta Tau only in the mechanics of alcohol abuse and tactics to avoid detection." Appellant's Br. p.

18.  According to Meyer, a jury could view this evidence and conclude that Sigma Pi's breach of its duty to guide and inform "created an environment for Beta Tau members to freely abuse alcohol with Sigma Pi's blessing." *Id.*

[34]  We simply cannot agree.  While we do not condone the practice of Sigma Pi's consultants, in no way can those occurrences be found to be a proximate cause of Meyer's injuries in this case.  On the night in question, Meyer and Meals were both intoxicated from consuming alcohol on their own time.  None of the alcohol was consumed at fraternity functions.  Instead, the evidence establishes that these two individuals had a history of interpersonal tension, that Meyer goaded Meals into a confrontation on the night in question, and that Meals was unable to manage his anger in an appropriate way.  In short, there is absolutely no evidence in the record remotely tending to establish that the fact that Sigma Pi's consultants occasionally drank alcohol with fraternity members in *any way* led to the altercation at issue in this case, and it can be said as a matter of law that any alleged breach of the duty to inform and guide did not proximately cause Meyer's injuries.  Consequently, the trial court did not err by granting summary judgment in Sigma Pi's favor on this claim.

## B.  Beta Tau

## 1.  Duty

[35]  Next, Meyer argues that Beta Tau assumed a duty to protect him at parties. Unlike a more removed national fraternity, Meyer argues that "because a local chapter of a fraternity is in such close proximity to its members, a genuine issue

of material fact exists as to whether a local chapter has a duty to protect its members when it has implemented policies to provide security for its members." Appellant's Br. p. 19. Meyer contends that Beta Tau assumed this duty by selecting members to maintain security at parties. We agree with Meyer that Beta Tau had a duty to protect its members (and their guests) by providing security at parties thrown by the fraternity.

## 2. Breach

[36] Meyer contends that Beta Tau breached its duty to protect him by failing to provide security at the "closed party" he was attending when the altercation occurred. We disagree.

[37] There were only three people present at the 803 house until Meals arrived, reaching a total of four people. It stretches the bounds of credibility to call this gathering a party, even a "closed" party. And there is no evidence in the record tending to show that this informal gathering was a fraternity-sanctioned or – provided event. To hold that Beta Tau had a duty to provide security at this informal gathering of three people would be to hold, essentially, that it had a duty to provide security at all times, and there is no basis in law or fact to find that such an extreme, broad duty existed. Therefore, Beta Tau's failure to provide security at this gathering was not a breach of any duty it may have had

to Meyer. The trial court properly granted summary judgment in Beta Tau's favor on this issue.[4]

# C. House Corporation

[38] House Corporation owns the real estate on which Beta Tau's houses are located. A landowner has a duty to exercise reasonable care to protect an invitee while the invitee is on the landowner's premises. *Burrell v. Meads*, 569 N.E.2d 637, 639-40 (Ind. 1991). The duty "only extends to harm from the conduct of third persons that, under the facts of a particular case, is reasonably foreseeable to the proprietor." *Kroger Co. v. Plonski*, 930 N.E.2d 1, 7 (Ind. 2010).

[39] In this case, the record reveals that the altercation occurred at a small gathering of three to four people at three in the morning. The altercation erupted after Meyer began antagonizing Meals as soon as Meals walked through the door. Before the altercation, Meyer was not afraid or concerned that Meals would attack him, even though they had spent the previous several hours together at the other fraternity house. Meyer was unable to cite to a single, specific incident in the past that was similar to the one in question. Moreover, Meyer never officially reported the 2008 altercation to Beta Tau or the House Corporation. Given all of these undisputed facts, we conclude that the fight that erupted between Meals and Meyer was unforeseeable to House

---

[4] Because we find as a matter of law that Beta Tau's actions did not constitute a breach of duty, we need not consider whether the actions were a proximate cause of Meyer's injuries.

Corporation as a matter of law.  As a result, summary judgment in favor of House Corporation on this issue was not erroneous.

# III.  Dram Shop Act

[40]     Next, Meyer argues that there is a genuine issue of material fact related to the Dram Shop Act that should prevent summary judgment.  Our primary goal in statutory construction is to ascertain and give effect to the intent of the legislature.  *Gray v. D & G, Inc.*, 938 N.E.2d 256, 269 (Ind. Ct. App. 2010).  We apply a de novo standard of review to questions of statutory interpretation.  *Id.* at 259.

[41]     The Dram Shop Act states as follows:

> (a)     As used in this section, "furnish" includes barter, deliver, sell, exchange, provide, or give away.
>
> (b)     A person who furnishes an alcoholic beverage to a person is not liable in a civil action for damages caused by the impairment or intoxication of the person who was furnished the alcoholic beverage unless:
>
> > (1)     the person furnishing the alcoholic beverage had actual knowledge that the person to whom the alcoholic beverage was furnished was visibly intoxicated at the time the alcoholic beverage was furnished; and
> >
> > (2)     the intoxication of the person to whom the alcoholic beverage was furnished was a proximate cause of the death, injury, or damage alleged in the complaint.
>
> (c)     If a person who is at least twenty-one (21) years of age suffers injury or death proximately caused by the person's voluntary intoxication, the:
>
> > (1)     person;
> >
> > (2)     person's dependents;

> (3)   person's personal representative; or
>
> (4)   person's heirs;
>
> may not assert a claim for damages for personal injury or death against a person who furnished an alcoholic beverage that contributed to the person's intoxication, unless subsections (b)(1) and (b)(2) apply.

I.C. § 7.1-5-10.15.5. The alcohol provider's knowledge of the patron's intoxication may be proved by either indirect or circumstantial evidence. *Gariup Constr. Co. v. Foster*, 519 N.E.2d 1224, 1230 (Ind. 1988). Factors to be considered in determining whether there was actual knowledge of intoxication include "what and how much the person was known to have consumed, the time involved, the person's behavior at the time, and the person's condition shortly after leaving." *Delta Tau Delta*, 712 N.E.2d at 974. When there is insufficient evidence to support actual knowledge, the issue may be resolved as a matter of law. *Id.*

[42] Meyer argues that there is disputed evidence in the record regarding Beta Tau's liability under the Dram Shop Act. Specifically, he argues that there is evidence in the record indicating that Beta Tau was serving alcohol to partygoers in the basement of the 805 house. He notes that Meyer saw Meals drinking alcohol, and argues that "[t]he only inference to be drawn is that Meals was drinking from a common source of alcohol that the fraternity had provided." Appellant's Br. p. 22-23. Furthermore, Meyer argues that it could be found from the record that "Beta Tau's provision of alcohol was the proximate cause of Meals'[s] assault on [Meyer]." *Id.* at 23.

[43]   We disagree with Meyer's assessment of the record. Instead, we agree with Beta Tau that "the undisputed evidence shows that Beta Tau did not even furnish Meals with alcohol, let alone furnish him with alcohol knowing that he was intoxicated." Appellees' Br. p. 37. As to whether Beta Tau provided Meals with alcohol, while Meyer testified that he saw beer in the refrigerator, he did not know how much beer there was, what kind of beer it was, who it belonged to, or who had purchased it. Furthermore, while he recalls seeing alcohol being served from the bar, he observed people serving each other and themselves, and testified that he believes the alcohol being served had been purchased by various fraternity members.

[44]   As to knowledge of Meals's intoxication, Meals testified that he drank two whiskey sours over the course of the night, and Meyer testified that he saw Meals drinking alcohol at the gathering in the basement. There is no evidence regarding how much alcohol Meals consumed beyond the two whiskey sours, Meals's behavior throughout the night, or his condition during or at the close of the evening. Consequently, there is no evidence in the record tending to establish that Beta Tau had actual knowledge of Meals's intoxication or that Beta Tau furnished Meals with alcohol on the night in question. Therefore, the trial court did not err by granting summary judgment in favor of Beta Tau on this issue.

# IV. Defamation

Finally, Meyer argues that the record contains sufficient evidence to support his defamation claims against Calder and the House Corporation to survive summary judgment. The law of defamation was created to protect individuals from reputational attacks. *Columbus Specialty Surgery Ctr. v. Se. Ind. Health Org., Inc.*, 22 N.E.3d 665, 669 (Ind. Ct. App. 2014). A defamatory communication is one that "'tends so to harm the reputation of another as to lower him in estimation of the community or to deter a third person from associating or dealing with him.'" *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 686 (Ind. 1997) (quoting Restatement (Second) of Torts § 559 (1977)). To prevail on a claim of defamation, a plaintiff must prove four elements: (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages. *Columbus Specialty*, 22 N.E.3d at 669.

Meyer argues that the letter drafted by Calder and copied to the officers of the House Corporation was defamatory. In relevant part, the Letter states as follows:

> . . . Given that you don't remember the events that took place on that morning I am of the mindset that you are actually more interested in settling an outstanding vandetta [sic] against a current active member living at the house than in getting some type of justice.
>
> The police report you filed is now being viewed by everyone, this includes the University and other alumni as well as the city. Being that you are aware House Corporation's next step is to try and get a permit to replace the foundation of the house, I consider this frivolous attempt at retribution as a blatent [sic] disregard for the fraternity and the House Corporation as a whole.

I cannot allow an active member to use the law and the fraternity grounds to settle a score.

That said, since the member you have filed charges against is currently living at the fraternity house and you are not, I would highly recommend that you avoid the fraternity properties until further notice.

\*\*\*

Should additional actions of yours come to light that further prove your intentions of retribution[,] the [H]ouse [C]orporation will re-evaluate the situation at that time.

Appellant's App. p. 463.

[47] For a statement to be actionable, it must be clear that it contains objectively verifiable fact regarding the plaintiff. *Hamilton v. Prewett*, 860 N.E.2d 1234, 1243 (Ind. Ct. App. 2007). If the speaker is merely expressing his subjective view, interpretation, or theory, then the statement is not actionable. *Id.*

[48] Calder contends that the statements in the Letter were merely non-actionable, non-verifiable statements of opinion. Meyer points out that if a statement is susceptible to both defamatory and non-defamatory meanings, the matter of interpretation should be left to the trier of fact. *Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 457 (Ind. 1999). On this issue, we agree with Meyer. A reasonable finder of fact could conclude that Calder's statements in the Letter went beyond mere statements of opinion.

[49] Even if we were to find that there are genuine issues of material fact on the defamatory nature of the Letter, however, we must consider the common interest qualified privilege. This privilege applies to communications made in good faith on any subject matter in which the party making the communication

has an interest or duty, if made to a person having a corresponding interest or duty. *Schrader v. Eli Lilly & Co.*, 639 N.E.2d 258, 262 (Ind. 1994). The privilege may be lost if it is abused. *Holcomb v. Walter's Dimmick Petroleum, Inc.*, 858 N.E.2d 103, 106-07 (Ind. 2006).

[50] Calder contends that he made the statements in the Letter in good faith, on a subject in which he had an interest, to a limited group of people, concerning a subject in which all members of the group had a corresponding interest. Consequently, he argues that even if his statements were defamatory, he is protected by this privilege.

[51] Meyer responds that a privilege asserted as a defense to defamation cannot be decided as a matter of law if facts giving rise to the privilege are in dispute. *Chambers v. Am. Trans Air, Inc.*, 577 N.E.2d 612, 615 (Ind. Ct. App. 1991). Meyer argues that there is an issue of material fact regarding whether Calder acted with ill will in drafting and sending the Letter. *See id.* at 616 (holding that the common interest privilege is lost when defamatory statements are motivated by ill will). Therefore, Meyer argues that this issue should be determined by the trier of fact.

[52] We disagree. The undisputed evidence in the record establishes that, in fact, Calder was acting in good faith to attempt to resolve tensions at Beta Tau. First, he made a non-binding request for Meyer to stay away from the houses, and then, when Meyer refused to comply, Calder formally banned him from the premises. Calder did so after consulting with multiple people within the local

and national fraternities as well as employees affiliated with the University. Calder took these actions with care and consideration, and we find nothing in the record tending to establish that he acted with ill will. As a result, he is protected by the common interest privilege as a matter of law, and the trial court properly entered summary judgment in favor of both Calder and the House Corporation on this issue.

[53] As a final aside, we note that even if the common interest privilege did not apply, the defamation claim is barred by the Volunteer Protection Act. 42 U.S.C. § 14501 *et seq*. This Act was enacted to "provide certain protections from liability abuses related to volunteers serving nonprofit organizations and governmental entities." 42 U.S.C. § 14501(b). A person who is protected by the Act cannot be held liable for harm caused by him in the scope of his responsibilities unless the harm is caused by "willful or criminal misconduct, gross negligence, reckless misconduct or a conscious, flagrant indifference to the rights or safety of the individual harmed by the volunteer." 42 U.S.C. § 14503.

[54] Meyer concedes that the House Corporation is a nonprofit organization and Calder was a volunteer within the meaning of the Volunteer Protection Act. 42 U.S.C. § 14505(6). Furthermore, when drafting and mailing the Letter, Calder was acting in the scope of his responsibilities as President of the House Corporation.

Given our conclusion above that there is no evidence in the record establishing that Calder acted with ill will, it is a given that there is likewise a dearth of evidence remotely showing that Calder acted with gross negligence, reckless misconduct, or a flagrant indifference to Meyer's rights. Consequently, Calder's actions with respect to the Letter are protected by the Volunteer Protection Act, and summary judgment was properly entered in his favor.

The judgment of the trial court is affirmed.

Najam, J., and Friedlander, J., concur.