

FILED

Nov 30 2015, 6:47 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Richard C. Bucheri
Poynter & Bucheri, LLC
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Thomas E. Rosta
Metzger Rosta, LLP
Noblesville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Pamela Marlow,

*Appellant-Plaintiff,*

v.

Better Bars, Inc.,

*Appellee-Defendant.*

November 30, 2015

Court of Appeals Case No.
32A01-1504-CT-144

Appeal from the Hendricks
Superior Court

The Honorable Stephenie LeMay-Luken, Judge

Trial Court Cause No.
32D05-1007-CT-24

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Plaintiff, Pamela Marlow as guardian and next friend of Kenneth Marlow (Marlow), appeals the trial court's summary judgment in favor of Appellee-Defendant, Better Bars, Inc., d/b/a Bubbaz Bar & Grill (the Bar), in Marlow's negligence action.

We reverse and remand.

## ISSUE

Marlow raises one issue on appeal, which we restate as follows: Whether the trial court erred by granting the Bar's motion for summary judgment.

## FACTS AND PROCEDURAL HISTORY[1]

On July 12, 2008, sometime between 10:00 p.m. and 11:30 p.m., Marlow finished his shift as a cook at Squealers Barbeque Grill in Mooresville, Indiana. Marlow and several of his co-workers—including the general manager, Matthew Hein (Matthew), and assistant general manager, Kevin Hein (Kevin)—made plans to meet at the Bar after work. Although alcohol is served at Squealers, there is no indication that Marlow consumed any alcoholic beverages before leaving work. The Bar, located in Camby, Hendricks County, Indiana, is about five minutes away from Squealers. When Matthew and Kevin

---

[1] We remind the parties that, pursuant to Indiana Administrative Rule 9(G)(2)(f), the "[c]omplete Social Security Numbers of living persons" are confidential and "must be excluded from Public Access."

arrived at the Bar between approximately 11:30 p.m. and midnight, Marlow was already there.

[5] At the Bar, both Matthew and Kevin had only brief interactions with Marlow; however, both sensed that Marlow was intoxicated. Kevin specifically remembered seeing Marlow consume alcohol at the Bar and observed that Marlow was "[j]ust not being hisself [*sic*]. He's usually more of a quiet person. But at the [B]ar he was walking around, socializing with people, and he's more of a stick-to-himself kind of guy." (Appellant's App. p. 49). During his deposition, Kevin explained that he has a license to serve liquor and has been trained to observe the signs of intoxication. Other than Marlow being more upbeat than usual, Kevin stated that he did not observe any behaviors indicative of visible intoxication that would have precluded a bartender from serving Marlow alcohol. A co-owner of the Bar, David Henderson (Henderson), recalled talking with Marlow that evening and observed that Marlow "was in a good mood" and "thought he was having a good time." (Appellant's App. pp. 56-57). Based on their conversation, Henderson believed that Marlow had been drinking at another local tavern prior to his arrival at the Bar. Although Henderson could not remember whether he personally served any alcohol to Marlow, his recollection is that Marlow consumed "a mixed drink. I don't know if it was a [Jägerbomb] or something like that. That's what I think that he had." (Appellant's App. p. 57). When Matthew and Kevin left the Bar at approximately 1:00 a.m., Marlow was still there.

[6] At approximately 2:30 a.m. on July 13, 2008, Officer Christopher Evan Love (Officer Love) of the Hendricks County Sheriff's Department, was dispatched to the White Castle restaurant in Camby after a restaurant employee reported that "there was an intoxicated male in the drive-thr[u] causing problems, being belligerent." (Appellant's App. p. 59). When Officer Love arrived at White Castle, he located the reportedly intoxicated driver—later identified as Marlow—parked in front of the drive-thru window.[2] Officer Love walked up to Marlow's vehicle and tapped on the passenger-side window, observing that Marlow "appeared to be kind of dazed or intoxicated." (Appellant's App. p. 60). Officer Love detected the odor of alcohol on Marlow's breath, and Marlow, whose speech was slurred, admitted that he had been drinking. At Officer Love's request that he submit to field sobriety tests, Marlow "staggered from his vehicle." (Appellant's App. p. 60).

[7] Before initiating the field sobriety testing, Officer Love recognized that Marlow's vehicle was blocking the drive-thru lane, and a long line had formed. Thus, Officer Love secured Marlow in handcuffs—informing him that he was not yet under arrest—and instructed Marlow to stand in front of his squad car while he moved Marlow's vehicle out of the way. After moving Marlow's vehicle, Officer Love intended to resume his investigation of Marlow for operating while intoxicated (OWI). However, Marlow, with his hands cuffed

---

[2] Marlow admitted in his deposition that he has never held a valid driver's license. Officer Love also noted in his Probable Cause Affidavit that the registration on Marlow's vehicle was "[f]alse/[f]ictitious." (Appellant's App. p. 159).

behind his back, took off running across the White Castle parking lot towards State Road 67—a four-lane highway divided by a grassy median. Officer Love pursued Marlow on foot, but after making it safely across the northbound lanes of traffic, Marlow was struck twice in the southbound lanes by two motorists, Beth St. John (St. John) and Harvey Higginbotham (Higginbotham). After Marlow was transported to Wishard Memorial Hospital in Indianapolis, a blood draw was performed, which revealed that his blood alcohol content (BAC) was 0.206%. Another blood sample was taken at 5:17 a.m., which indicated that Marlow's average BAC was 0.158%.[3]

[8] As a result of the collisions, Marlow sustained a broken leg, a broken arm, broken ribs, a fractured skull, and brain trauma. He spent more than three months recovering in the hospital. According to Marlow, he can no longer write, he has no sense of smell or taste, and he suffers from both short-term and long-term memory loss. Marlow claims to have no recollection of the events that occurred on July 12-13, 2008.

---

[3] "A person who operates a vehicle with an alcohol concentration equivalent to at least eight-hundreds (0.08) gram of alcohol but less than fifteen-hundredths (0.15) gram of alcohol per . . . one hundred (100) milliliters of the person's blood . . . commits a Class C misdemeanor." Ind. Code § 9-30-5-1(a)(1) (2008). However, "[a] person who operates a vehicle with an alcohol concentration equivalent to at least fifteen-hundredths (0.15) gram of alcohol per . . . one hundred (100) milliliters of the person's blood . . . commits a Class A misdemeanor." I.C. § 9-30-5-1(b)(1) (2008).

[9] On July 12, 2010, Marlow filed his First Amended Complaint for Damages against the Bar, St. John, and Higginbotham. As against the Bar, Marlow alleged that it violated Indiana's Dram Shop Act, specifically contending that

> employees or agents of [the Bar] negligently, wrongfully and unlawfully served intoxicating liquor to [Marlow] while [Marlow] was in a visible state of intoxication, and continued to sell such liquors to [Marlow] even though they knew or should have known that doing so increased the danger that [Marlow] would act in an unpredictable and/or unreasonable manner.

(Appellant's App. p. 31). With respect to St. John and Higginbotham, Marlow claimed that his injuries were the direct and proximate result of their "negligence and carelessness" in the operation of their vehicles. (Appellant's App. p. 37).

[10] On October 30, 2014, the Bar filed a Motion for Summary Judgment. In a memorandum accompanying its motion, the Bar asserted that it could not be held liable under the Dram Shop Act as a matter of law because there is no evidence that the Bar had actual knowledge that Marlow was visibly intoxicated at the time he was served an alcoholic beverage. In addition, the Bar claimed that it was entitled to summary judgment because Marlow's own conduct constituted an intervening act such that the Bar's actions were not the proximate cause of Marlow's injuries. On March 2, 2015, the trial court conducted a hearing, and on March 9, 2015, the trial court granted summary judgment in favor of the Bar. The trial court found "that [Marlow] has no evidence to show that [the Bar] had any actual knowledge that [Marlow] was

intoxicated at the time he was furnished an alcoholic beverage(s) by [the Bar's] [e]mployees." (Appellant's App. p. 11).

On March 30, 2015, Marlow filed a motion to certify the trial court's Order for interlocutory appeal, which the trial court granted on March 31, 2015. On May 22, 2015, we accepted jurisdiction of Marlow's appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

In reviewing the trial court's award of summary judgment, we rely on the same standard as utilized by the trial court: summary judgment is appropriate "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C); *Murdock v. Fraternal Order of Eagles*, 779 N.E.2d 964, 967 (Ind. Ct. App. 2002), *reh'g denied, trans. denied*. In making this determination, we may only consider the evidentiary matter that the parties have specifically designated to the trial court. *Vanderhoek v. Willy*, 728 N.E.2d 213, 215 (Ind. Ct. App. 2000). We will construe all of the designated materials and factual inferences in favor of the non-moving party. *Id.* "Witness credibility and the relative apparent weight of evidence are not relative considerations at summary judgment." *Pierson ex rel. Pierson v. Serv. Am. Corp.*, 9 N.E.3d 712, 715 (Ind. Ct. App. 2014), *trans. denied*. In addition, we note that the trial court did not enter special findings of fact and conclusions thereon but did make one partial finding in support of its judgment. Therefore, "we treat

the judgment as a general one merely supported by [a] partial finding[] and will affirm on any theory." *Booker, Inc. v. Morrill*, 639 N.E.2d 358, 361 (Ind. Ct. App. 1994).

[13] Where, as here, the defendant is the party moving for summary judgment, "the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim." *Pierson ex rel. Pierson*, 9 N.E.3d at 714-15. Once the movant "has met this burden with a prima facie showing, the burden shifts to the nonmoving party to establish that a genuine issue does in fact exist." *Merchants Nat'l Bank v. Simrell's Sports Bar & Grill, Inc.*, 741 N.E.2d 383, 386 (Ind. Ct. App. 2000). "A genuine issue of material fact exists where the facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue." *Vanderhoek*, 728 N.E.2d at 215. Where the facts are undisputed, summary judgment is nevertheless inappropriate if "the record reveals an incorrect application of the law to the facts." *Id.*

[14] Furthermore, the trial court granted the Bar's motion for summary judgment, and this determination is "'clothed with a presumption of validity.'" *Murdock*, 779 N.E.2d at 967. Thus, Marlow "has the burden of persuading [our] court that the entry of summary judgment was erroneous." *Ward v. D & A Enterprises of Clark Cnty., Inc.*, 714 N.E.2d 728, 729 (Ind. Ct. App. 1999). While summary judgment is rarely appropriate in negligence cases, it is proper "when the

undisputed material evidence negates one element of a negligence claim."
*Meyer v. Beta Tau House Corp.*, 31 N.E.3d 501, 508 (Ind. Ct. App. 2015). In order to prevail on a negligence claim, a plaintiff must establish "that (1) the defendant owed plaintiff a duty, (2) the defendant breached that duty, and (3) plaintiff's injury was proximately caused by the breach." *Id.* For purposes of this case, "[t]he duty to conduct oneself to avoid harm from another person's intoxication is embodied in Indiana's Dram Shop Act." *Pierson ex rel. Pierson*, 9 N.E.3d at 715.

## II. *Indiana's Dram Shop Act*

[15] Indiana's Dram Shop Act "represents a legislative judgment and the declared public policy of this state that providers of alcoholic beverages should be liable for the reasonably foreseeable consequences of knowingly serving visibly intoxicated persons." *Id.* at 716. At the time of the incident, the Dram Shop Act provided that "[i]t is unlawful for a person to sell, barter, deliver, or give away an alcoholic beverage to another person who is in a state of intoxication if the person knows that the other person is intoxicated." I.C. § 7.1-5-10-15(a) (2004).[4] Upon a violation of this provision, a person or entity is subject to civil liability "for damages caused by the impairment or intoxication of the person who was furnished the alcoholic beverage" if:

---

[4] Effective July 1, 2014, the Dram Shop Act was amended to provide that "[a] person who, knowing that another person is intoxicated, sells, barters, delivers, or gives away an alcoholic beverage to the intoxicated person commits a Class B misdemeanor." I.C. § 7.1-5-10-15(a) (2014).

(1) the person furnishing the alcoholic beverage had actual knowledge that the person to whom the alcoholic beverage was furnished was visibly intoxicated at the time the alcoholic beverage was furnished; and

(2) the intoxication of the person to whom the alcoholic beverage was furnished was a proximate cause of the death, injury, or damage alleged in the complaint.

I.C. § 7.1-5-10-15.5(b) (2004). The furnisher of alcohol may be held liable for the damages sustained by third parties as well as those incurred by the intoxicated person himself. *See* I.C. § 7.1-5-10-15.5(c) (2004) (applying in situations where the intoxicated person is at least twenty-one years old and "suffers injury or death proximately caused by the person's voluntary intoxication").

### A. *Actual Knowledge of Visible Intoxication*

Marlow claims that the trial court erroneously granted summary judgment in favor of the Bar because there is a genuine issue of material fact as to whether the Bar had actual knowledge that Marlow was visibly intoxicated at the time he was furnished alcohol by the Bar's employees. It is well established that actual knowledge of visible intoxication "is judged by a subjective standard." *Ward*, 714 N.E.2d at 729-30.

> Absent an admission that the person furnishing alcohol had actual knowledge of the other's intoxication, the trier of fact must look to reasonable inferences based upon an examination of the surrounding circumstances. Actual knowledge of intoxication can be inferred from indirect or circumstantial evidence such as "what and how much the person was known to have consumed,

the time involved, the person's behavior at the time, and the person's condition shortly after leaving." Where, however, there is insufficient evidence to support actual knowledge, the issue may be resolved as a matter of law.

*Delta Tau Delta, Beta Alpha Ch. v. Johnson*, 712 N.E.2d 968, 974 (Ind. 1999) (internal citations omitted), *declined to follow on other grounds by Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048 (Ind. 2003).

[17] In the present case, looking to the Bar's designated materials, we find no evidence to conclusively establish how much alcohol Marlow consumed that night or whether he consumed alcohol anywhere other than the Bar. In his deposition, Kevin indicated that he witnessed either a "[b]artender or server" furnishing alcohol to Marlow at the Bar. (Appellant's App. p. 100). However, other than Henderson's recollection that Marlow "was in a good mood" and was possibly served one Jägerbomb, there is no evidence from any other employees of the Bar about furnishing alcohol to Marlow or Marlow's condition at the time he was served. (Appellant's App. p. 56). Although he recalled speaking with Marlow on the night of the accident, Henderson could not remember whether he had personally served alcohol to Marlow and further stated that Marlow was only at the Bar long enough to consume one beverage and had discussed drinking at other establishments that evening. Accordingly, the Bar maintains that summary judgment was properly granted because "[t]here was absolutely no evidence presented to the [t]rial [c]ourt of any actual knowledge on the part of the employees of [the Bar] that Marlow was 'visibly

intoxicated' when he was served with any alcoholic beverages on the night in question." (Appellee's Br. p. 11).

[18] In response, Marlow points to the deposition of Kevin, who "sensed that Marlow was intoxicated because he was acting a little bit out of character"— *i.e.*, Marlow seemed intoxicated because he was "socializing with people," whereas he is generally a quiet, "stick-to-himself kind of guy." (Appellant's App. pp. 49, 79). Marlow also cites to a statement by Matthew that "Marlow appeared to be more intoxicated than he had ever seen him in the past" and believed that Marlow "was most likely drinking liquor and beer in large quantities." (Appellant's App. p. 106). However, this evidence provides no indication as to the subjective knowledge of the Bar at the time Marlow was served an alcoholic beverage. Absent any indicia of impairment, it is unreasonable to expect the Bar to recognize a patron's deviation from a normal character trait as a sign of visible intoxication. *See Delta Tau Delta*, 712 N.E.2d at 974-75 (finding insufficient evidence of visible intoxication where the record demonstrated that the allegedly intoxicated individual "may have been more talkative than usual, but he was not rowdy or stumbling or having verbal difficulties").

[19] Nonetheless, the toxicology evidence reveals that within two hours after the accident, Marlow's BAC was 0.206%. A subsequent blood draw revealed an average BAC of 0.158%. The evidence establishes that Marlow was still at the Bar when Matthew and Kevin departed at approximately 1:00 a.m. The record is silent as to how long Marlow remained at the Bar thereafter, but it is

undisputed that he was causing a disturbance at a nearby White Castle at 2:30 a.m. At that time, Officer Love observed numerous signs of intoxication on Marlow: the odor of alcohol, slurred speech, glassy eyes, and unsteady balance.

[20] In addition, Marlow designated as evidence the opinions of his two expert witnesses: Major Mark Willingham (Major Willingham) and Dr. Eldon H. Nyhart, Jr. (Dr. Nyhart).[5] According to Major Willingham:

> Assuming that Mr. Marlow began drinking at [the Bar] at 11:00PM, he would reasonably have been served and consumed approximately [nineteen] standard drink units (SDU) (one SDU is the equivalent of one [twelve-]ounce standard beer) in order to achieve a 0.153g% BAC at the time of the blood draw at 5:17AM at Wishard Memorial Hospital, some 6 ¼ hours after he reasonable [sic] began drinking the previous evening. Not only is the service of [nineteen] SDUs in this short period of time unreasonable and negligent, that level of alcohol service would have yielded a BAC of as much as 0.20g% during the time he was at [the Bar] and as much as 0.206[%] at the time Mr. Marlow was at the White Castle [r]estaurant.

(Appellant's App. p. 120). Major Willingham further expressed:

> Between 0.13-0.15[%] BAC, more likely than not Mr. Marlow would have evident impairment of his gross motor control while in [the Bar]. Mr. Marlow may suffer from blurred vision and would evidence loss of balance. Mr. Marlow's euphoria would

---

[5] Major Willingham, a graduate of the FBI National Academy, is a Ph.D. candidate focusing on "responsible alcohol sales procedures" and provides expertise "in Dram Shop cases, underage sales and alcoholic beverage premises liability matters." (Appellant's App. p. 141). Dr. Nyhart has a Ph.D. in Biopharmaceutics and Pharmacokinetics and is an expert in matters of "absorption, distribution, metabolism, elimination and effects associated with chemical entities in biological systems." (Appellant's App. p. 165).

be dropping and his anxiety and restlessness may be beginning to appear. Mr. Marlow's judgment and perception would be severely impaired.

Between 0.16[%] and 0.19[%] BAC, more likely than not Mr. Marlow would transition to a feeling of being unhappy and his anxiety, depression and restlessness would increase. Mr. Marlow would exhibit the appearance of a "sloppy drunk."

(Appellant's App. p. 120) (footnotes omitted). Similarly, based on the toxicology evidence and using reverse extrapolation, Dr. Nyhart submitted an affidavit, opining that "[a]t the end of his first hour at [the Bar], [Marlow] would have exhibited a BAC of 0.13[%]" and "[a]s he drank more alcohol, the alcohol would have continued accumulating in his body until it reached 0.25[%]." (Appellant's App. p. 166). In order to achieve a BAC of 0.25% by 1:15 a.m., Dr. Nyhart calculated that Marlow would have needed to consume "approximately 176g of alcohol . . . over a [two] hour period" which "corresponds to approximately [twelve] shots of 80 proof alcohol or its equivalent." (Appellant's App. p. 170). Thus, Dr. Nyhart stated that, in his "professional opinion, to a reasonable degree of scientific probability," "Marlow was visibly intoxicated during his stay at [the Bar] and that the person(s) serving him alcohol would have had actual knowledge of this intoxication . . . . These behaviors would have been present while Marlow was at White Castle after leaving [the Bar]." (Appellant's App. p. 166).

[21] We find the present case to be similar to *Booker, Inc.*, 639 N.E.2d at 358. In *Booker, Inc.*, after an individual left a tavern, where he had consumed "at least

eight to ten beers and three shots of peppermint schnapps[,]" he was killed in a car accident. *Id.* at 360. When the decedent's wife sued the tavern for the negligent provision of alcohol, the bartenders testified that the decedent had not exhibited any signs of intoxication. *Id.* However, the BAC of the decedent at the time of the accident was 0.21%, and the decedent's wife presented the opinion of a toxicologist that any person with such a BAC "will exhibit physical signs of intoxication. Among those signs are a loss of hand-eye coordination, impaired balance, stumbling, staggering gait, drowsiness, mental confusion, disorientation, exaggerated emotional state, blurred vision, and loss of consciousness." *Id.* Our court found that the toxicologist's testimony was

> circumstantial evidence that [the decedent] was exhibiting signs of intoxication at the time the bartenders provided him with alcohol. The fact that the bartenders along with other witnesses denied such manifestations is not controlling. The court was free to disbelieve that testimony and to conclude instead that based on the amount of alcohol [the decedent] consumed and the behavior he must have been exhibiting at the time in question, the bartenders knew [he] was visibly intoxicated yet continued to serve him with alcohol.

*Id.* at 362.

[22] Here, as in *Booker, Inc.*, it is undisputed that Marlow consumed at least one alcoholic beverage at the Bar. Thereafter, Officer Love observed numerous signs of impairment, including slurred speech, watery/bloodshot eyes, and unsteady balance, and Marlow was involved in two serious collisions after running onto a highway. Also, Marlow subsequently registered a BAC of

0.206% and 0.158%, which two experts opined would have caused him to exhibit visible indicia of intoxication at the Bar. Based on the "independent evidence of [Marlow's] level of intoxication"—notwithstanding whether Henderson or any other Bar employee acknowledges that Marlow exhibited visible signs of intoxication at the time he was served—a trier of fact could reasonably infer that Marlow was visibly intoxicated when the Bar served him alcohol and that the Bar did so with actual knowledge of his intoxication. *Murdock*, 779 N.E.2d at 969; *see Vanderhoek*, 728 N.E.2d at 217 (finding that "a trier of fact could reasonably infer" actual knowledge of visible intoxication where, shortly after consuming at least three beers at the bar, the intoxicated individual was involved in an accident, failed several sobriety tests, and registered a BAC of 0.15%).

[23] Moreover, regardless of any evidence indicating that Marlow *might* have consumed alcohol elsewhere prior to the accident, "it is the role of the fact-finder to determine whether any one drink was served to [Marlow] by someone [at the Bar] knowing him to be visibly intoxicated." *Pierson ex rel. Pierson*, 9 N.E.3d at 719; *see Ward*, 714 N.E.2d at 730 (finding that it was the bar's "responsibility as the moving party to establish the non-existence of every material question of fact" and "as long as 'it is unknown where [the intoxicated individual] consumed alcohol sufficient to register a [BAC of 0.22%],' [the bar] has failed to meet this responsibility"). Accordingly, viewing the evidence most favorably to Marlow, we find the fact that the Bar "served even one [drink] to a person who shortly thereafter was in a serious state of intoxication gives rise to

a question of fact whether [Marlow] was visibly intoxicated at the time." *Ward*, 714 N.E.2d at 730. Summary judgment on this issue was improper.

### B. *Proximate Cause*

"[E]ven though a proprietor may have a statutory duty to refrain from providing alcoholic beverages to intoxicated persons, the proprietor will not be held liable unless the alleged violation is the proximate cause of the person's death or injury." *Merchants Nat'l Bank*, 741 N.E.2d at 389; *see* I.C. § 7.1-5-10-15.5(b)(2) (2004). Thus, "[p]roximate cause places an effective limit on dram shop liability[.]" *Pierson ex rel. Pierson*, 9 N.E.3d at 716 (alteration in original). Accordingly, notwithstanding whether the Bar breached its statutory duty under the Dram Shop Act by serving alcohol to a visibly intoxicated Marlow, the Bar maintains that it is entitled to judgment as a matter of law because its breach was not the proximate cause of Marlow's injuries.

"A party's act is the proximate cause of an injury if it is the natural and probable consequence of the act and should have been reasonably foreseen and anticipated in light of the circumstances." *Fast Eddie's v. Hall*, 688 N.E.2d 1270, 1274 (Ind. Ct. App. 1997), *reh'g denied, trans. denied*. "To be considered a proximate cause, the negligent act must have set in motion a chain of circumstances which, in natural and continuous sequence, led to the resulting injury." *Merchants Nat'l Bank*, 741 N.E.2d at 389. However, the "willful, malicious criminal act of a third party" constitutes "an intervening act which breaks the causal chain between the alleged negligence and the resulting harm." *Fast Eddie's*, 688 N.E.2d at 1274. As our court has previously stated, "[t]he

foreseeability of an intervening cause and, thus, whether a defendant's conduct is a proximate cause of the plaintiff's injury, presents a question of fact for the jury." *Pierson ex rel. Pierson*, 9 N.E.3d at 716. Yet, proximate cause is a question of law suitable for summary judgment "where only a single conclusion can be drawn from the facts." *Fast Eddie's*, 688 N.E.2d at 1274.

[26] The Bar asserts that "[i]t is extremely tenuous to try and argue that any intoxication on the part of Marlow and th[e] subsequent actions which occurred in this case were foreseeable to the employees of [the Bar]." (Appellee's Br. p. 14). Specifically, "Marlow's own criminal actions in attempting to flee the police and thus getting struck by two vehicles while running across a major highway in Hendricks County caused his injuries and thus broke any chain of causation between any alleged negligence on the part of [the Bar] (which is refuted anyway) and the injuries of Marlow." (Appellee's Br. p. 14). Marlow, in turn, claims that the trial court erred in granting summary judgment because "[i]t was foreseeable that a person in a high level of intoxication will attempt to flee from the police as Marlow did." (Appellant's Br. p. 26).

[27] The Bar claims that the present situation is analogous to *Fast Eddie's*, 688 N.E.2d at 1274-75, in which our court concluded that the trial court should have entered summary judgment in favor of a tavern. In *Fast Eddie's*, after consuming alcoholic beverages at the tavern, the defendant sexually assaulted and murdered the woman he had been drinking with at the tavern. *Id.* We found that the defendant's "intentional criminal acts were the intervening cause of [the woman's] death which broke the causal chain between [the tavern's]

negligence and [the] sexual assault and death." *Id.* at 1275. We further stated that "[u]nlike automobile accidents which occur as the result of alcoholic beverage consumption, assault and murder are intentional acts of volition which are the result of an assailant's deliberate design[,]" and the defendant's "criminal intent would have been present whether or not [he] was intoxicated." *Id.*

[28]   In the case at hand, there is no question that Marlow disregarded Officer Love's instructions and committed a criminal act by fleeing. Nevertheless, according to Major Willingham:

> More likely than not, Marlow's BAC at the time of his injury may have been as high as 0.206g%. At such a high level of blood alcohol, more likely than not Mr. Marlow's ability to make rational and appropriate decisions was affected causing him to act impulsively in running from [Officer] Love and from entering a paved roadway in the face of oncoming vehicles.

(Appellant's App. pp. 123-24). Despite the Bar's contention, we cannot say that Marlow's criminal intent would have been present even if he was not intoxicated. Unlike intentional acts of volition such as murder and assault, an OWI is the natural and probable consequence of consuming alcoholic beverages; thus, a tavern should reasonably foresee that an over-served patron will be subject to an OWI investigation. Based on the evidence presented in this case, a trier of fact *could* reasonably infer that Marlow's intoxication impaired his judgment to the extent that he fled from his OWI encounter with Officer Love and disregarded the dangers of running onto a four-lane highway

in the middle of the night. Because there is a genuine issue of material fact as to whether the Bar knowingly served alcohol to a visibly intoxicated Marlow, the proximate cause of which resulted in Marlow's injuries, we conclude that the trial court erred in granting the Bar's motion for summary judgment.

## CONCLUSION

[29] Based on the foregoing, we conclude that the trial court erred in granting summary judgment because there are genuine issues of material fact regarding whether the Bar had actual knowledge that Marlow was visibly intoxicated when it served him even one alcoholic beverage and whether the Bar's conduct was the proximate cause of Marlow's injuries. We therefore reverse the trial court's entry of summary judgment and remand the case for further proceedings.

[30] Reversed and remanded.

[31] Altice, J. concurs

[32] Brown, J. dissents with separate opinion

| | |
|---|---|
| Pamela Marlow, | Court of Appeals Case No. |
| *Appellant-Plaintiff*, | 32A01-1504-CT-144 |
| v. | |
| Better Bars, Inc., | |
| *Appellee-Defendant*. | |

**Brown, Judge, dissenting.**

[33] While I agree with the majority that the designated evidence shows a genuine issue of material fact as to whether the Bar had actual knowledge of Marlow's visible intoxication, I respectfully dissent from its conclusion that an issue of fact exists regarding whether the Bar proximately caused Marlow's injuries. "Proximate cause is the limitation which courts have placed on the actor's responsibility for the consequences of his act or failure to act." *Fast Eddie's v. Hall*, 688 N.E.2d 1270, 1274 (Ind. Ct. App. 1997), *reh'g denied*, *trans. denied*. As

acknowledged by the majority, "a willful, malicious criminal act of a third party is an intervening act which breaks the causal chain between the alleged negligence and the resulting harm," proximate cause may not be found where an intervening act is present, and under such circumstances the issue becomes a question of law appropriate for a court to determine. *See id.*

[34] In *Fast Eddie's*, the manager at the tavern in question asked Michael Lamb to remove Teresa Hall from the premises because the manager "noticed that Hall had become heavily intoxicated and was having difficulty sitting up on her bar stool." *Id.* at 1271. Lamb did so and put Hall in the car of his friend, John Schooley. *Id.* At one point, Schooley left the tavern and drove to his trailer, and Hall remained passed out in the passenger seat of his car. *Id.* Subsequently, Lamb drove to Schooley's trailer, noticed Hall in the car, and put her in his car. *Id.* Afterward, he drove to the Riley Conservation Club and shot Hall in the abdomen and head, resulting in her death. *Id.* There was also evidence that Hall had been sexually assaulted. *Id.* Hall's blood alcohol was later tested at .23%. *Id.* Her estate sued the tavern under the Dram Shop Act, alleging that it violated the act "by serving Lamb and Hall alcoholic beverages when they were visibly intoxicated." *Id.* The tavern filed a motion for summary judgment which was denied by the trial court. *Id.* at 1272.

[35] On appeal, this Court held that, "even assuming Fast Eddie's breached its statutory duty under the Dram Shop Act, its breach was not the proximate cause of Hall's sexual assault and death." *Id.* at 1274-1275. The Court first noted that "the chain of causation in the instant case is extremely tenuous"

because "[a]lthough Lamb initially escorted Hall out of the tavern, he returned to the bar after Schooley drove Hall to his trailer" and that it was later in the evening when he "decided to proceed to Schooley's home, found Hall passed out in Schooley's car and killed her." *Id.* at 1275. The court also found that "even if the chain of causation [was] stronger, Lamb's intentional criminal acts were the intervening cause of Hall's death which broke the causal chain between Fast Eddie's negligence and Hall's sexual assault and death" and that "[t]herefore, Fast Eddie's alleged violation of the statute was not the proximate cause of Hall's sexual assault and death." *Id.*

[36] Although the chain of causation between the acts of serving alcohol to Marlow and his injuries is less tenuous than in *Fast Eddie's*, I believe that the intentional criminal act of resisting law enforcement by running into the middle of a busy highway broke the causal chain. The court in *Fast Eddie's* recognized the difference between "automobile accidents which occur as the result of alcoholic beverage consumption," and assault and murder, which "are intentional acts of volition which are the result of an assailant's deliberate design." *Id.* Similarly, Marlow's act of running from the police and into the highway was an intentional act of volition, rather than something which occurred by accident as a result of his state of intoxication. This criminal intent is not negated by the fact that Marlow was voluntarily intoxicated. *See Sanchez v. State*, 749 N.E.2d 509, 520 (Ind. 2001) (noting that, generally, voluntary intoxication does not negate a criminal actor's *mens rea* and in fact satisfies the intent element of the

crime). The fact that Marlow manifested this criminal intent in the course of an OWI investigation is immaterial.

[37] The intervening act of Marlow resisting law enforcement by running from the police and into the middle of a four-lane highway at night leads to the single conclusion that the Bar was not the proximate cause of Marlow's injuries. The Bar was accordingly entitled to summary judgment in its favor. For this reason, I respectfully dissent from the majority's conclusion to reverse the trial court's grant of summary judgment in the Bar's favor, and would affirm the trial court.